## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KAREN MARIN MORENO and JOHN CROAK,<br><br>                                    Plaintiffs,<br><br>            -against-<br><br>ELLEN K. RITCHIE, M.D., NEWYORK-PRESBYTERIAN / WEILL CORNELL MEDICAL CENTER, and NEW YORK-PRESBYTERIAN HEALTHCARE SYSTEM, Inc.,<br><br>                                    Defendants. | Civil Action No.:<br>1:25-cv-8188<br><br>ECF Action<br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiffs KAREN MARIN MORENO and JOHN CROAK, by and through their attorneys, The Jacob D. Fuchsberg Law Firm, LLP, as and for their Complaint against Defendants as above captioned, allege as follows, upon information and belief:

### PRELIMINARY STATEMENT

1.     This is an action brought for negligence and professional malpractice in connection with the deficient medical care provided to injured Plaintiff KAREN MARIN MORENO (hereinafter "Ms. Marin Moreno") by Defendants NEWYORK-PRESBYTERIAN / WEILL CORNELL MEDICAL CENTER and NEW YORK-PRESBYTERIAN HEALTHCARE SYSTEM, Inc., and their respective agents, servants, contractors, and employees, including but not limited to Defendant ELLEN K. RITCHIE, M.D. (hereinafter "Dr. Ritchie"), a hematology oncologist.

2.     Plaintiff JOHN CROAK (hereinafter "Mr. Croak"), as Ms. Marin Moreno's lawfully wedded spouse, asserts a derivative claim for loss of spousal consortium, services, and support.

3.      Ms. Marin Moreno, now 31 years of age, sought the medical diagnosis, care, and treatment of Defendants Dr. Ritchie, NEWYORK-PRESBYTERIAN / WEILL CORNELL MEDICAL CENTER, and NEW YORK-PRESBYTERIAN HEALTHCARE SYSTEM, Inc. (hereinafter collectively "Defendants" or "Defendant providers"), from on or around May 8, 2023, continuously through on or around September 19, 2024, due to her prolonged abnormal blood results and intractable pruritus, in addition to her unintentional weight loss and swollen neck. These symptoms progressively worsened over time without relief, which should have been alarming to Defendants, especially given Dr. Ritchie's specialty in hematology oncology.

4.      Beginning in or around December 2021, Ms. Marin Moreno began to develop an itching sensation and rashes throughout her body. In 2022, Ms. Marin Moreno saw an allergist as well as a dermatologist seeking relief, but they were unable to resolve her symptoms. Continued topical and steroid treatments did not resolve her pruritus, indicating that her intractable pruritus was not due to simple allergies or infection.

5.      On or around April 18, 2023, Ms. Marin Moreno presented to her non-party primary care physician (hereinafter "PCP") for a physical exam. Bloodwork obtained by the PCP subsequently showed numerous abnormal results, including an extremely low iron count, elevated white blood cell count (leukocytosis), and elevated platelet count (thrombocytosis). As a result of the abnormal blood results that were concerning for a blood disorder, coupled with the intense intractable pruritus, Ms. Marin Moreno was referred to Defendant providers for hematology/oncology consultation.

6.      From Ms. Marin Moreno's very first presentation on May 8, 2023, the Defendants were aware of her abnormal blood labs and excruciating itching across her body that would interfere with her sleep and other day-to-day functions. Defendants were also aware that Ms. Marin

Moreno had tried a variety of medications for the pruritus, to no avail. Defendants knew or should have known that these signs and symptoms in a then-29-year-old patient were suggestive of serious medical conditions including potential malignancies. In particular, intractable pruritus in a young person such as Ms. Marin Moreno is indicative of Hodgkin's lymphoma as a presumptive diagnosis, as it is a textbook manifestation of the disease. Defendants improperly failed to consider Hodgkin's lymphoma as a differential diagnosis, or to perform diagnostic tests that would have resulted in the diagnosis of Hodgkin's lymphoma in an initial stage.

7.    Between May 8, 2023 and September 19, 2024, Ms. Marin Moreno presented to the Defendants on over 10 occasions, each time complaining of severe and unrelieved pruritus, which interfered with her ability to sleep, work, and perform daily tasks. Over the course of these 10 visits, the itching became even more extreme, such that Ms. Marin Moreno developed multiple scratch marks and scars, which were apparent to and documented by the Defendant providers. The itching sensations had become so torturous that Ms. Marin Moreno sometimes felt that she could understand why people kill themselves. In addition, in each of these approximately 10 visits, Ms. Marin Moreno's blood labs consistently worsened, with persisting leukocytosis and thrombocytosis amongst other increasing and unexplained abnormalities. Nonetheless, Defendants failed to take Ms. Marin Moreno's complaints seriously, as shown by the lack of physical exam, radiological imaging, and differential diagnosis including lymphoma.

8.    Over the year and a half when she was treating with the Defendants, Ms. Marin Moreno continued developing additional symptoms indicative of Hodgkin's lymphoma, including a visibly enlarged neck and unintentional weight loss to less than 100 lb. Defendants still failed to consider Hodgkin's lymphoma as a differential diagnosis, or to perform diagnostic tests that would have resulted in the diagnosis of Hodgkin's lymphoma in an initial stage.

9.     Beginning on May 8, 2023 and at every subsequent appointment, Defendants should have considered Hodgkin's lymphoma in their differential diagnosis for Ms. Marin Moreno and should have conducted the requisite testing and imaging to confirm or rule out this diagnosis, including but not limited to a chest x-ray or CT.

10.     It is inexplicable and extraordinary that a chest scan was not performed until September 2024, when Ms. Marin Moreno's non-party PCP ordered one at Ms. Marin Moreno's own request for a body scan. Defendant Dr. Ritchie dismissed previous inquiries by Ms. Marin Moreno regarding performing scans or x-rays, claiming that they were unnecessary. Instead, Defendants kept giving Ms. Marin Moreno iron supplementation, which treated one symptom of Hodgkin's lymphoma, but not the underlying cause.

11.     Even though Ms. Marin Moreno's history, symptoms, condition, and complaints during each encounter with the Defendants for over a year were consistent with, and suggestive of, Hodgkin's lymphoma, Defendants erroneously attributed Ms. Marin Moreno's symptoms to other unlikely causes, including Myeloproliferative Neoplasms (hereinafter "MPN"), allergies, gynecological issues, or colitis. None of these diagnoses were indicated based on the symptoms and presentation of Ms. Marin Moreno, or they were ruled out early on. Defendants' negligence is particularly striking given their specialty in hematology and oncology, meaning that Hodgkin's lymphoma fits squarely within their purported expertise.

12.     When Ms. Marin Moreno raised concerns regarding potential malignancy, Defendants tested her only for MPN, even though the Defendants knew or should have known that Ms. Marin Moreno's symptoms were not due to MPN. All the testing that the Defendants performed, including two painful bone marrow biopsies and bloodwork, were negative for MPN. Nevertheless, Defendants stood firm in their incorrect diagnosis, failing to consider the most

obvious cause for her symptoms—classic Hodgkin's lymphoma.

13.    Ms. Marin Moreno's cancer was finally diagnosed in September 2024, not by the Defendants, but rather by her non-party PCP who agreed to her request for radiology scans. A thyroid ultrasound performed on or around August 29, 2024, showed a mass in the right neck measuring 3.6 * 2.0 * 2.4 cm, and a left neck mass measuring 4.5 * 3.2 * 3.0 cm, with lymphoma being the most likely consideration. A chest x-ray performed on or around August 29, 2024 revealed that Ms. Marin Moreno had a 14 cm * 12 cm anterior mediastinal mass, which had grown so much that she had fractured  ribs. A subsequent core biopsy of the mass confirmed classic Hodgkin's lymphoma, bulky disease. Despite being informed of this finding, Defendant Dr. Ritchie never followed up with Ms. Marin Moreno or spoke with her again.

14.    As a result of Defendants' failure to consider Hodgkin's lymphoma in their differential diagnosis and order the requisite tests and imaging, Ms. Marin Moreno's cancer progressed and advanced until she was ultimately diagnosed with Stage IV Hodgkin's lymphoma and with a bulky disease with B symptoms. She has suffered permanent injuries, including but not limited to Stage IV Hodgkin's lymphoma, catastrophic pain and suffering, emotional distress, and loss of years of her life, as a direct result of Defendants' failure to provide proper diagnosis, care, and treatment during a critical period, depriving her of a substantial chance for cure and best treatment, long-term survival, short-term survival, and better prognosis.

15.    Despite seeing the Defendants who specialize in blood cancer approximately 10 times between May 2023 and September 2024, Ms. Marin Moreno did not obtain an explanation or diagnosis as to her symptoms, and was often made to think that the itching sensation was in her head. She also had to suffer through painful and unnecessary procedures, including but not limited to two bone marrow biopsies. As a result of the Defendants' failure to diagnose, detect, and treat

Ms. Marin Moreno's cancer in a timely manner, she was subjected to over a year of excruciating pruritus, causing her to suffer pain, inability to sleep, fatigue, scars and scratch marks, anxiety, and depression. By around May 2024, Ms. Marin Moreno had to quit her job as a nanny due to the constant itching that affected her 24 hours a day. To this day, she has been unable to return to work. She has also been unable to pursue a career in social work or counseling as she had intended.

16.    Due to the advanced stage of her cancer, Ms. Marin Moreno required 12 cycles of aggressive chemotherapy promptly after the diagnosis was made in September 2024, without a feasible opportunity for fertility preservation. To this day, Ms. Marin Moreno requires ongoing medical treatment and cancer care, and suffers from fear of death. Her quality of life, as well as her husband's, has significantly deteriorated because of the delay in diagnosis under the Defendants' care.

17.    Shortly after being diagnosed with cancer and starting treatment in or around September 2024, Ms. Marin Moreno's itching began to subside, and she could discontinue iron supplements as well, indicating that her symptoms of pruritus and anemia were directly attributable to the underlying Hodgkin's lymphoma.

18.    Plaintiffs hereby seek redress for Defendants' negligence and professional malpractice, which caused Ms. Marin Moreno to suffer permanent and catastrophic injuries including, but not limited to, Stage IV Classic Hodgkin's lymphoma; bulky disease; loss of years of life; loss of substantial opportunity for cure and better outcome; loss of substantial opportunity for better prognosis and survivability; loss of substantial opportunity for better and improved clinical course and response to treatment; loss of substantial opportunity for less aggressive treatment; loss of substantial opportunity for prevention of disease progression, morbidity, and mortality; increased chances of recurrence and relapse of cancer; loss of quality of life; loss of

enjoyment of life; agony; mental anguish; emotional distress; pain and suffering; infertility; broken ribs; mediastinal mass; enlarged thyroid; enlarged lymph nodes; enlarged neck; unintended weight loss; past loss of earnings; future loss of earnings; need for past and future medical interventions; need for chemotherapy; side effects to chemotherapy; and past and future pecuniary and financial losses; and which deprived Mr. Croak of his lawfully wedded wife, Ms. Marin Moreno's consortium, services, support, financial support, companionship, friendship, and affection.

## JURISDICTION AND VENUE

19.     This Court has original jurisdiction of this action pursuant to 28 U.S.C. § 1332 as premised upon the diversity of citizenship among the parties, as Plaintiff Karen Marin Moreno is a subject of a foreign state who is lawfully admitted for permanent residence with a green card who is domiciled in the State of New Jersey. Plaintiff John Croak is a citizen and domiciliary in the State of New Jersey. Defendants are citizens and domiciliaries in the State of New York, with their principal and actual places of business in New York County of the State of New York.

20.     The amount in controversy exceeds, exclusive of interest and costs, the sum specified in 28 U.S.C. § 1332.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events, transactions, and occurrences giving rise to the Plaintiffs' claims occurred in this District.

## PARTIES

22.     At all times relevant hereto, Plaintiff KAREN MARIN MORENO resided and was domiciled at 302 Silverside Avenue, Little Silver, NJ 07739 in the State of New Jersey.

23.     At all times relevant hereto, Plaintiff JOHN CROAK resided and was domiciled at 302 Silverside Avenue, Little Silver, NJ 07739 in the State of New Jersey.

24.     At all times relevant hereto, Defendant NEWYORK-PRESBYTERIAN / WEILL CORNELL MEDICAL CENTER was and is a healthcare center domiciled in the State of New York, having its principal place of business at 525 East 68th Street, New York, New York 10065.

25.     At all times relevant hereto, Defendant NEW YORK-PRESBYTERIAN HEALTHCARE SYSTEM, Inc. was and is a domestic not-for-profit corporation domiciled in the State of New York that manages New York-Presbyterian Hospitals including Weill Cornell Medical Center, having its service agent located at 466 Lexington Avenue, New York, New York 10017.

26.     At all times relevant hereto, Defendants NEWYORK-PRESBYTERIAN / WEILL CORNELL MEDICAL CENTER and NEW YORK-PRESBYTERIAN HEALTHCARE SYSTEM, Inc. (hereinafter collectively "NYP Weill Cornell") were corporations and/or entities established and operating under the law of the State of New York.

27.     At all times relevant hereto, Defendants NYP Weill Cornell were corporations and/or entities organized under and existing by virtue of the laws of the State of New York, and were responsible for the operation, control, or maintenance of a healthcare facility, medical facility, health center, medical office, clinic, and/or hospital known as New York Presbyterian Weill Cornell Medical Center or Weill Cornell, located at 525 East 68th Street, New York, New York 10065, where patients including Plaintiff Ms. Marin Moreno could receive care and treatment, and be examined and treated, for various ailments or medical conditions, including, but not limited to: blood disorders, cancers, malignancies, blood cancers, leukocytosis, thrombocytosis, pruritus, swollen lymph nodes, enlarged neck, unintentional weight loss, and/or Hodgkin's lymphoma.

28.     At all times relevant hereto, Defendants NYP Weill Cornell held themselves out to

the public, including to the Plaintiffs, as operating a healthcare facility known as Weill Cornell where patients including Ms. Marin Moreno could receive care and treatment, and be examined and treated, for various ailments or medical conditions, including, but not limited to: blood disorders, cancers, malignancies, blood cancers, leukocytosis, thrombocytosis, pruritus, swollen lymph nodes, enlarged neck, unintentional weight loss, and/or Hodgkin's lymphoma.

29. At all times relevant hereto, Defendants NYP Weill Cornell hired, retained, supervised, managed, and controlled personnel who provided medical care to Plaintiff Ms. Marin Moreno, including but not limited to Defendant ELLEN K. RITCHIE, M.D.

30. At all times relevant hereto, Defendant Dr. Ritchie was and is a citizen of the State of New York.

31. At all times relevant hereto, Defendant Dr. Ritchie was and is a Doctor of Medicine, duly licensed to practice medicine in the State of New York, and an agent, servant, contractor, and/or employee of Defendants NYP Weill Cornell.

32. At all times relevant hereto, in her capacity as an agent, servant, contractor, and/or employee of NYP Weill Cornell, Defendant Dr. Ritchie treated patients including Ms. Marin Moreno.

33. At all times relevant hereto, Defendant Dr. Ritchie was a physician duly licensed to practice medicine in the State of New York, who was Board Certified in Internal Medicine with sub-certifications in Hematology and Medical Oncology.

34. At all times relevant hereto, Defendant Dr. Ritchie held herself out publicly as being competent in the diagnosis, care, and treatment of patients in general, and Plaintiff Ms. Marin Moreno in particular, in accordance with good and accepted standards of medical care and treatment.

35.     At all times relevant hereto, Defendant Dr. Ritchie practiced medicine and rendered medical services, care, and treatment at NYP Weill Cornell, at a hospital and/or medical center located at 525 East 68th Street, New York, New York 10065, and at its clinics, medical offices, radiology suites, patient rooms, treatment locations, and at other locations, as NYP Weill Cornell's agent, servant, employee, contractor, and/or attending.

36.     At all times relevant hereto, Defendant Dr. Ritchie supervised other agents, servants, and/or employees rendering medical care and treatment at NYP Weill Cornell, including but not limited to Maureen Thyne, PA.

## JURY DEMAND

37.     Plaintiffs hereby demand a trial by jury as to all claims and issues in this action.

## STATEMENT OF FACTS COMMON TO ALL COUNTS

38.     Beginning in or around December 2021, Ms. Marin Moreno started experiencing pruritus. As it persisted, she began presenting to several non-party doctors to treat the itching, including her primary care physician, dermatologist, and ENT/allergist. She described the itching as constant over her arms, face, legs, veins, and torso. Despite going through many different types of treatments and medications in attempts to resolve the itching, ultimately, it did not go away but rather only worsened over time.

39.     On or around April 18, 2023, Ms. Marin Moreno presented to her non-party PCP for a physical exam. The PCP noted that she had multiple scratches from severe pruritus. The bloodwork from this encounter subsequently showed numerous abnormal results, including an iron deficiency, elevated white blood cell count (leukocytosis), and elevated platelet count (thrombocytosis). As a result of the abnormal blood results, coupled with the intractable pruritus, Ms. Marin Moreno was referred to the Defendant providers.

40.     On or around May 8, 2023, Ms. Marin Moreno, then 29 years of age, had an initial encounter with Defendants Dr. Ritchie and NYP Weill Cornell, and their agents, servants, and employees, for medical care and treatment. Specifically, she presented for a consult for leukocytosis and thrombocytosis, in addition to her terrible pruritus which made her feel as though she was "allergic" to everything including water. Her husband Mr. Croak reiterated the intractable nature and severity of Ms. Marin Moreno's pruritus during this encounter, describing that she even scratches in her sleep. The itching affected her daily life and functions.

41.     During this visit, on or around May 8, 2023, Defendant Dr. Ritchie did not perform a physical exam of Ms. Marin Moreno. Despite the severity of Ms. Marin Moreno's pruritus, Dr. Ritchie did not appear to take her condition seriously—in fact, Dr. Ritchie's only note about Ms. Marin Moreno's physical exam was that she had multiple tattoos, a fact wholly irrelevant to her treatment and a reflection of Dr. Ritchie's lackadaisical attitude towards this patient.

42.     If Defendant Dr. Ritchie had properly assessed Ms. Marin Moreno's severe and persistent pruritus, she would have acknowledged that this was a classic presentation of Hodgkin's lymphoma in a young patient, which is an oncological emergency that requires immediate imaging.

43.     Instead, in considering Ms. Marin Moreno's abnormal blood labs, Dr. Ritchie only considered MPN as a potential diagnosis. When ordering bloodwork, Dr. Ritchie specifically excluded lymphoma testing from her request. Dr. Ritchie never discussed with Ms. Marin Moreno that her symptoms could be due to Hodgkin's lymphoma or ordered imaging, such as a simple chest x-ray or CT, to rule out this diagnosis.

44.     On or around June 5, 2023, Ms. Marin Moreno returned to Defendant Dr. Ritchie for a follow-up appointment to go over the results of her bloodwork, all of which were negative for MPN. That said, as Dr. Ritchie acknowledged, the excruciating pruritus as well as leukocytosis

and thrombocytosis persisted. A reasonable medical provider, and in particular a hematology oncologist, would have had a strong suspicion for Hodgkin's lymphoma as a potential diagnosis at this point, and would have ordered radiological scans to confirm same. Instead, Dr. Ritchie merely noted that the MPN workup was negative, and started Ms. Marin Moreno on oral iron supplements to treat anemia. Anemia was in fact another indication of Hodgkin's lymphoma, together with intractable pruritus—not an underlying cause of Ms. Marin Moreno's condition. Dr. Ritchie departed from the standard of care by failing to include Hodgkin's lymphoma in her differential diagnosis, to order imaging, or to discuss the possibility of Hodgkin's lymphoma diagnosis with Ms. Marin Moreno.

45.    On or around July 12, 2023, Ms. Marin Moreno had an additional follow-up appointment with Defendant Dr. Ritchie, as she was still experiencing terrible pruritus and persistent leukocytosis and thrombocytosis. Dr. Ritchie noted that the iron supplementation was not working, and therefore recommended an IV supplementation. Again, while treating one aspect of Ms. Marin Moreno's hematological abnormality, Dr. Ritchie still failed to include Hodgkin's lymphoma in her differential diagnosis, to order imaging, or to discuss the possibility of Hodgkin's lymphoma diagnosis with Ms. Marin Moreno, despite her presentation with textbook symptoms of Hodgkin's lymphoma.

46.    On or around September 7, 2023, Ms. Marin Moreno returned for her fourth visit with Defendant Dr. Ritchie, still complaining of pruritus and blood count abnormalities, even after going through the IV iron infusions. Instead of considering Hodgkin's lymphoma as a cause of her underlying symptoms, Dr. Ritchie went down another obscure path, this time attributing her symptoms to a gynecological issue and referring her to a gynecologist.

47.    After promptly following up with a gynecologist on or around September 18, 2023,

and still seeing no improvement in her symptoms, on or around October 26, 2023, Ms. Marin Moreno returned to NYP Weill Cornell for a fifth time. She was seen by a different doctor, Michael Samuel, M.D., during this visit, who noted that she had scratch marks on her body from the pruritus. Therefore, it was clear that her symptoms were worsening, rather than improving. Ms. Marin Moreno complained that the itching was so severe it was inhibiting her ability to sleep. Her blood counts were also grossly abnormal across all categories.

48.    Despite the persistent symptoms with no resolution, Defendants still failed to consider obvious alternative causes, including Hodgkin's lymphoma. Instead, Defendant providers returned to a differential diagnosis that had already been ruled out—MPN. Despite the prior negative test and unlikelihood based on her symptoms, Defendant providers ordered a bone marrow biopsy to test Ms. Marin Moreno for MPN, which was predictably negative. Of note, bone marrow biopsy is not a valid test to detect or diagnose Hodgkin's lymphoma, especially when the disease is confined and has not spread to the bone marrow. The primary, standard test for diagnosis is a radiological scan, such as a chest x-ray or CT scan. Not only was the bone marrow biopsy unnecessary, but it was extremely painful and caused Ms. Marin Moreno to suffer ulcerative colitis flare-up requiring gastroenterology treatment.

49.    In addition to the bone marrow biopsy, cytogenetics studies were performed to test Ms. Marin Moreno again for MPN. Testing for lymphoma was specifically excluded by the ordering providers. The pathologist who interpreted the cytogenetics results on or around October 26, 2023, recommended additional clinical and laboratory workup to consider other causes of Ms. Marin Moreno's blood count abnormalities. Yet, Defendant providers continued to disregard Hodgkin's lymphoma as a potential cause of Ms. Marin Moreno's condition.

50.    Following this, on or around November 22, 2023, Ms. Marin Moreno returned to

meet with Defendant Dr. Ritchie for the sixth time, continuing to suffer from severe pruritus and her bloodwork continuing to demonstrate abnormalities including leukocytosis, thrombocytosis, and neutrophilia. Again, Defendant Dr. Ritchie noted that Ms. Marin Moreno had visible scratch marks from the pruritus, indicating its severity. Dr. Ritchie also noted that the itching had gotten so bad that Ms. Marin Moreno was "restricted in physically strenuous activity but ambulatory and able to carry out work of light or sedentary nature."

51.    Despite both the blood test results and the bone marrow biopsy being negative for MPN, Defendant Dr. Ritchie still maintained MPN as the likely diagnosis for Ms. Marin Moreno at this visit. Dr. Ritchie never considered Hodgkin's lymphoma in her differential diagnosis, despite the persistent pruritus, abnormal blood counts, and multiple negative MPN results. She claimed that the "only" inciting factor for abnormal blood counts may be gastroenterological issues, which could have a relationship with MPN, and therefore ordered gastroenterological follow-up as well as additional IV iron infusions.

52.    Ms. Marin Moreno promptly saw a non-party gastroenterologist, on or around November 30, 2023. The gastroenterologist confirmed ongoing itching as a major symptom, but also noted Ms. Marin Moreno's weight loss, which was not noted by the Defendant providers.

53.    Around this time, Ms. Marin Moreno also saw an orthopedist as neck and shoulder pain that was causing pain or discomfort, including in her work as a babysitter. On or around December 19, 2023, the orthopedist also noted that Ms. Marin Moreno was complaining of night sweats. These concerning symptoms, entirely missed by the Defendant providers throughout Ms. Marin Moreno's multiple visits, are also classic signs of Hodgkin's lymphoma. It is inexplicable that the Defendant providers missed these signs and symptoms that fell squarely within their specialty of hematology and oncology, while non-party providers were making note of them.

54.     After treating with the non-party gastroenterologist on multiple occasions in November and December of 2023, and still experiencing no relief in her symptoms, on or around January 24, 2024, Ms. Marin Moreno returned to NYP Weill Cornell for her seventh visit with Defendant Dr. Ritchie. Dr. Ritchie repeated the same notes about the visible scratch marks due to the pruritus, continued prescribing iron supplements, and still maintained MPN as the most likely diagnosis, despite the negative tests including bone marrow biopsy. Dr. Ritchie wholly failed to consider other types of malignancies, including Hodgkin's lymphoma.

55.     On or around April 24, 2024, Ms. Marin Moreno returned to Defendants' care for the eighth time, complaining of worsening pruritus, specifically along her legs, feet, and veins. She was seen by a physician assistant, Maureen Thyne, during this visit, who described Ms. Marin Moreno as "thin" at 97 lbs, without noting the oncologic significance of unintentional weight loss. PA Thyne did note concerns regarding Ms. Marin Moreno's persistent blood count abnormalities and symptoms, presumably referring to the pruritus that had persisted for over two years at this point. Nonetheless, again, there was no consideration or discussion of Hodgkin's lymphoma, or of conducting imaging studies to confirm or rule out Hodgkin's lymphoma. Instead, Defendant providers suggested that Ms. Marin Moreno have *another* bone marrow biopsy to test for MPN despite the prior negative results.

56.     At an annual physical exam on or around May 8, 2024, Ms. Marin Moreno's PCP noted Ms. Marin Moreno's dire condition due to the "itchiness over all body since two years ago," where she was "not sleeping, very stress[ed] out," and "very anxious with severe pruritic and hematological disorder," causing "anxiety and depression."

57.     On or around June 6, 2024, Ms. Marin Moreno returned to see the Defendant providers for the ninth time. Defendant Dr. Ritchie listed her chief complaint as MPN, despite all

the prior negative tests being contrary to this diagnosis. During this visit, Ms. Marin Moreno underwent another painful bone marrow biopsy to again test for MPN. Dr. Ritchie did not consider or perform any less invasive procedures, such as imaging studies, despite Ms. Marin Moreno's pleas. Dr. Ritchie also again specifically excluded lymphoma testing from her orders for lab tests, showing her fixation on the MPN diagnosis to the detriment of her patient who was in agony and distress.

58.     In her follow-up visit on or around June 20, 2024, Defendant Dr. Ritchie informed Ms. Marin Moreno that the second bone marrow biopsy was also negative for hematologic malignancy. Despite this finding, and despite the worsening pruritus and abnormal blood counts, there was still no discussion or consideration of Hodgkin's lymphoma. A simple chest x-ray would have been diagnostic of Ms. Marin Moreno's condition, which was a textbook presentation of classic Hodgkin's lymphoma. Instead of considering this obvious diagnosis, Dr. Ritchie recommended a referral to a dermatologist within NYP Weill Cornell for Ms. Marin Moreno's skin condition—knowing that Ms. Marin Moreno had already treated extensively with an allergist and a dermatologist *prior to* her initial encounter with Dr. Ritchie in May 2023. There was no urgency to address Ms. Marin Moreno's symptoms and complaints. Defendant Dr. Ritchie merely told Ms. Marin Moreno to return to her in six months following this visit, again demonstrating her lackadaisical attitude towards Ms. Marin Moreno's extreme suffering and blatant disregard towards Ms. Marin Moreno's time-sensitive medical needs.

59.     Trusting Defendant Dr. Ritchie's medical expertise, Ms. Marin Moreno followed her recommendation and saw a dermatologist Joanna Harp, M.D. at Weill Cornell in August 2024, who merely reiterated the possibility that pruritus can be "related to underlying hematologic abnormalities" without further differential diagnosis.

60. In summary, in each of the aforementioned visits that Ms. Marin Moreno had with Defendants, Defendants departed from the standard of care. Throughout these visits, Defendant providers, including Dr. Ritchie, failed to conduct a physical exam of Ms. Marin Moreno. If they had, over time, they would have detected the unintentional weight loss, swelling of her neck, and/or lymph nodes that progressively grew—each of which is another classic sign of Hodgkin's lymphoma.

61. Throughout these visits, Defendant Dr. Ritchie acted dismissively towards Ms. Marin Moreno's concerns about her symptoms and requests for testing, including for radiological scans. It is unclear whether Ms. Marin Moreno's ethnicity or heavy accent as a recent immigrant played a role in these interactions; Ms. Marin Moreno is fluent in English and normally has no communicative difficulties. As a result of Dr. Ritchie's failure to meaningfully address, document, or treat the signs of her cancer, Ms. Marin Moreno was often led to believe that the constant itching was in her head, when it is, in fact, a prototypical symptom of Hodgkin's lymphoma.

62. Over the course of over 10 visits with the Defendant providers, Hodgkin's lymphoma was never in the Defendants' differential diagnosis for Ms. Marin Moreno. She underwent numerous tests, for MPN, colitis, gynecological issues, dermatological issues, and allergies, even when each of the relevant assessments and subsequent treatments proved ineffectual.

63. For more than a year following her first presentation to Defendants on or around May 8, 2023, Ms. Marin Moreno's unrelieved symptoms and history were consistent with and suggestive of Hodgkin's lymphoma. Defendants, who specialize in hematologic cancer, failed to provide Ms. Marin Moreno with required medical attention and treatment, including timely diagnostic radiology scans, physical exams, and broader laboratory tests, which pursuits would

have diagnosed Ms. Marin Moreno's Hodgkin's lymphoma at an earlier stage, resulting in immediate intervention.

64.     Defendants' failure to develop a proper differential diagnosis for Ms. Marin Moreno's unexplained symptoms caused advancement of her Hodgkin's lymphoma from Stage I to Stage IV. She also developed an advanced, bulky disease, with B symptoms under the Defendants' care.

65.     Finally, on or around August 29, 2024, Ms. Marin Moreno's PCP noticed her enlarged thyroid gland and ordered a thyroid ultrasound and chest x-ray, revealing bilateral neck masses and a very large anterior mediastinal mass that had grown to fracture multiple ribs on the right posterior side. The non-party radiologists immediately noted lymphoma as the most likely consideration and ordered a chest CT as well as a hematology oncology consultation. The irony is that the Defendant providers *were* hematology oncologists, and had been seeing Ms. Marin Moreno for over a year at this point.

66.     A subsequent chest CT on or around September 9, 2024, and mediastinal mass core biopsy on or around September 13, 2024, confirmed a diagnosis of Stage IV classic Hodgkin's lymphoma, bulky disease.

67.     After the diagnosis was made, when Ms. Marin Moreno returned for treatment at NYP Weill Cornell, Defendant Dr. Ritchie no longer saw her. Instead, starting on or around September 19, 2024, Ms. Marin Moreno has been treating with Sarah Rutherford, M.D., at NYP Weill Cornell. At the initial visit on or around September 19, 2024, Dr. Rutherford immediately noted night sweats and fullness in neck with prominent veins bilaterally, which had not been noted or acknowledged in any of the prior visits with Defendant providers.

68.     From around September 2024 through around March 2025, Ms. Marin Moreno

underwent approximately 12 sessions of intensive chemotherapy as an attempt to reduce the size of the mass. Her itching was resolved as of November 2024, and she began gaining weight, reflecting the direct causal connection between Hodgkin's lymphoma and the symptoms that had plagued her. However, chemotherapy caused side effects including hot flashes, immune deficiencies, and muscle aches; required Ms. Marin Moreno to use an alopecia wig; and reduced the chance of normal pregnancy, which is significant for the young married couple. Due to the progression of her cancer, Ms. Marin Moreno required intensive chemotherapy that required close monitoring for toxicity.

69.    Ms. Marin Moreno was caused and will be required to undergo medical, oncologic, and associated care and treatment for the rest of her life, and both Plaintiffs will incur the costs and expenses of such care and treatment. Ms. Marin Moreno remains unable to work due to her levels of pain, fatigue, and treatment schedule.

70.    In summary, the medical, hematological, oncological, diagnostic, and/or other related care, treatment, and services provided by Defendants to Ms. Marin Moreno during relevant times were rendered carelessly, recklessly, unskillfully, negligently, and not in accordance with good and accepted standards of medical care and treatment in the community. As a direct result of Defendants' failure to provide adequate medical care and treatment to Ms. Marin Moreno during a critical and prolonged period, Plaintiffs have suffered injuries, losses, harm, and damages, both general and special, including but not limited to: Ms. Marin Moreno's Stage IV Classic Hodgkin's lymphoma; bulky disease; loss of years of life; loss of substantial opportunity for cure and better outcome; loss of substantial opportunity for better prognosis and survivability; loss of substantial opportunity for better and improved clinical course and response to treatment; loss of substantial opportunity for less aggressive treatment; loss of substantial opportunity for prevention of disease

progression, morbidity, and mortality; increased chances of recurrence and relapse of cancer; loss of quality of life; loss of enjoyment of life; agony; mental anguish; emotional distress; pain and suffering; infertility; broken ribs; mediastinal mass; enlarged thyroid; enlarged lymph nodes; enlarged neck; unintended weight loss; past loss of earnings; future loss of earnings; need for past and future medical interventions; need for chemotherapy; side effects to chemotherapy; and past and future pecuniary and financial losses; and Mr. Croak's loss of spousal consortium, services, support, financial support, companionship, friendship, affection, and past and future pecuniary and financial losses.

**FIRST CAUSE OF ACTION**
**(Medical Malpractice)**
**(Against All Defendants)**

71.      Plaintiffs hereby incorporate each of the foregoing paragraphs as if fully set forth herein.

72.      At all relevant times, Defendants Dr. Ritchie and NYP Weill Cornell, and/or their agents, servants, employees, and/or contractors, undertook a duty to possess and to exercise reasonable care in rendering, or endeavoring to render, medical, hematological, oncological, consulting, diagnostic, and other care, treatment, and services to Plaintiff Ms. Moreno, in accordance with the generally accepted standards of care, treatment, and services in the community.

73.      At all relevant times, Defendant Dr. Ritchie held herself out to patients, and in particular to Ms. Marin Moreno, as a physician and/or medical professional offering professional services.

74.      At all relevant times, Defendant Dr. Ritchie represented herself to be a skilled, competent, and careful healthcare provider with the knowledge and capacity to practice medicine

in accordance with the standards common and acceptable in the community.

75.    It was the duty of Defendants and their agents, servants, employees, and/or contractors, to diagnose, discover, and recognize the cause of Ms. Marin Moreno's unresolved symptoms and to run appropriate tests and evaluations.

76.    Defendants failed to acknowledge, diagnose, or treat Ms. Marin Moreno's serious and progressive medical condition.

77.    Defendants failed to rule out Hodgkin's lymphoma as they should have as part of the differential diagnosis, especially in light of Ms. Marin Moreno's age and persisting symptoms at each encounter.

78.    Defendants failed to consider Hodgkin's lymphoma diagnosis where classic symptoms of Hodgkin's lymphoma persisted, and yet, the Defendants made no finding or diagnosis that could adequately explain those symptoms.

79.    Defendants failed to timely and properly order, perform, conduct, recommend, and/or refer Ms. Marin Moreno for appropriate imaging tests, including but not limited to chest x-ray, chest CT, and/or other appropriate diagnostic, laboratory, blood, and/or imaging tests.

80.    Defendants failed to properly and timely observe or acknowledge the implications of the tests and examinations that they did perform, to ascertain Ms. Marin Moreno's medical condition.

81.    Defendants failed to timely obtain proper and informed consent for the care and treatment rendered to Ms. Marin Moreno.

82.    As set forth herein, Defendant Dr. Ritchie's care, diagnosis, treatment, and services of Ms. Marin Moreno were rendered carelessly, recklessly, unskillfully, negligently, and not in accordance with accepted standards of medical care, diagnosis, treatment, and services in the

community as the standards existed at the time.

83.    Defendant Dr. Ritchie did not possess the necessary skill to care for and treat Ms. Marin Moreno.

84.    Defendant Dr. Ritchie neglected to apply the skill she did have.

85.    Defendant Dr. Ritchie did not use reasonable care in applying the skill she had.

86.    Defendant Dr. Ritchie was negligent and departed from the standard of care in other ways that are documented in the medical records and in ways of which Plaintiffs are not yet aware.

87.    At all relevant times, each of the Defendants stood in such a relationship with the other Defendant in their care and treatment of Ms. Marin Moreno, as to make each of the Defendants liable for the acts and omissions of the other Defendant with regard to their care, diagnosis, and treatment rendered to Ms. Marin Moreno or lack thereof.

88.    Defendants NYP Weill Cornell is liable for Defendant Dr. Ritchie's negligence under the doctrine of respondeat superior.

89.    Plaintiffs' injuries, losses, and damages herein were caused by the carelessness, recklessness, negligence, medical malpractice, and deviations from accepted standards of care and treatment alleged herein of Defendants and their agents, servants, employees, and/or contractors, who were on duty and acting within the scope of their employment when they engaged in the wrongful conduct described herein.

90.    Plaintiffs' injuries, losses, and damages were inflicted solely through the Defendants' carelessness, recklessness, negligence, medical malpractice, and deviations from accepted standards of care and treatment, and through no fault or want of care or negligence or contributory negligence on the Plaintiffs' part.

91.    Defendants' conduct was grossly negligent in that Defendants were so careless as

to show complete disregard for the rights and safety of Ms. Marin Moreno.

92.     Defendants were aware of facts that gave rise to an unreasonable risk that Ms. Marino Moreno would be irreparably injured.

93.     Defendants' conduct constitutes the tort of medical malpractice under the laws of the State of New York.

94.     This action falls within one or more of the exceptions set forth in CPLR § 1602, and as such, the Defendants are jointly and severally liable pursuant to the exceptions set forth in Article 16 of the CPLR.

95.     Pursuant to CPLR § 1602(2)(iv), Defendants are jointly and severally liable for all of Plaintiffs' damages, including but not limited to non-economic loss, by reason of the fact that Defendants' liability arose by reason of a non-delegable duty of care owed to Plaintiff Ms. Marin Moreno and/or by reason of the doctrine of respondeat superior.

96.     Pursuant to CPLR § 1602(7), Defendants are jointly and severally liable for all of Plaintiffs' damages, including but not limited to non-economic loss, by reason of the fact that Defendants acted in such a reckless manner as to completely disregard the consequences of their actions on the safety of others including Ms. Marin Moreno.

97.     As a direct and proximate result of Defendants' medical malpractice, Ms. Marin Moreno suffered pain, emotional distress, and permanent and catastrophic injuries, among other injuries, losses, harm, and damages, both general and special.

98.     As a direct and proximate result of Defendants' medical malpractice, Plaintiffs sustained damages exceeding the sum or value of $75,000.00, exclusive of interest and costs, as required by 28 U.S.C. § 1332, in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Lack of Informed Consent)
### (Against All Defendants)

99.    Plaintiffs hereby incorporate each of the foregoing paragraphs as if fully set forth herein.

100.    Defendants, and/or their agents, servants, employees, and contractors failed to inform Ms. Marin Moreno, her family members, and/or her representatives of the risks, hazards, and alternatives to the treatment proposed and rendered, in consequence of which the Defendants failed to obtain proper informed consent thereto.

101.    A reasonably prudent person in the position of Ms. Marin Moreno would not have undergone the diagnosis, treatment and care rendered herein, had they been fully and properly informed.

102.    Plaintiffs' injuries, losses, and damages herein were caused by the aforesaid lack of informed consent alleged herein of Defendants and their agents, servants, employees, and/or contractors, who were on duty and acting within the scope of their employment when they engaged in the wrongful conduct described herein.

103.    Defendants' conduct alleged herein constitutes the tort of lack of informed consent under the laws of the State of New York.

104.    As a direct and proximate result of the aforesaid lack of informed consent, Ms. Marin Moreno suffered pain, emotional distress, and permanent and catastrophic injuries, among other injuries, losses, harm, and damages, both general and special.

105.    As a direct and proximate result of the aforesaid lack of informed consent, Plaintiffs sustained damages exceeding the sum or value of $75,000.00, exclusive of interest and costs, as required by 28 U.S.C. § 1332, in an amount to be determined at trial.

**THIRD CAUSE OF ACTION**
**(Negligent Hiring, Retention, Training, and Supervision)**
**(Against Defendants NYP Weill Cornell)**

106.    Plaintiffs hereby incorporate each of the foregoing paragraphs as if fully set forth herein.

107.    At all relevant times, it was the duty of Defendants NYP Weill Cornell to hire, train, retain, grant privileges to, renew privileges to, and supervise its agents, servants, and/or employees to operate, maintain, and manage the healthcare facility otherwise known as Weill Cornell.

108.    At all relevant times, it was the duty of Defendants NYP Weill Cornell to hire, train, retain, and supervise their agents, servants, and/or employees to operate, maintain, and manage the healthcare facility otherwise known as Weill Cornell.

109.    Defendants NYP Weill Cornell were negligent in hiring, training, retaining, and supervising medical personnel such as Defendant Dr. Ritchie, who were careless, reckless, unskillful, negligent, and who did not possess the requisite knowledge and skill of medical professionals in the community.

110.    Upon information and belief, Defendants NYP Weill Cornell failed to use reasonable care in the hiring, training, retention, and supervision of Defendant Dr. Ritchie and other medical personnel who were on duty and acting in the scope of their employment when they rendered careless, reckless, unskillful, and negligent care to Ms. Marin Moreno.

111.    Defendants' conduct alleged herein constitutes the tort of negligence under the laws of the State of New York.

112.    As a direct and proximate result of Defendants' negligence, Ms. Marin Moreno suffered pain, emotional distress, and permanent and catastrophic injuries, among other injuries, losses, harm, and damages, both general and special.

113.    As a direct and proximate result of Defendants' negligence, Plaintiffs sustained damages exceeding the sum or value of $75,000.00, exclusive of interest and costs, as required by 28 U.S.C. § 1332, in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION
### (Loss of Spousal Consortium, Services, Support, and Society)
### (Against All Defendants)

114.    Plaintiffs hereby incorporate each of the foregoing paragraphs as if fully set forth herein.

115.    At all relevant times, Plaintiff Mr. Croak was and is the lawful husband of the injured Plaintiff Ms. Marin Moreno.

116.    As such, Mr. Croak was and is entitled to Ms. Marin Moreno's consortium, services, support, society, and companionship.

117.    By reason of Defendants' carelessness, recklessness, negligence, medical malpractice, and deviations from accepted standards of care and treatment as alleged herein, Mr. Croak was deprived of said consortium, services, support, society, and companionship of Ms. Marin Moreno.

118.    As a result, Mr. Croak is entitled to compensatory damages for the loss of consortium, loss of services, loss of support, loss of society, loss of companionship, financial loss, emotional distress, and pain and suffering, among other injuries, losses, harm, and damages, both general and special.

119.    As a direct and proximate result of Defendants' acts and/or omissions, Plaintiffs sustained damages exceeding the sum or value of $75,000.00, exclusive of interest and costs, as required by 28 U.S.C. § 1332, in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Karen Marin Moreno and John Croak respectfully request that judgment be entered against each Defendant as follows:

a.    An award of compensatory damages for personal injuries, past and future pain and suffering, emotional distress, loss of enjoyment of life, loss of consortium, economic damages, both general and special, and other harm, in an amount to be determined at trial;

b.    An award of pre- and post-judgment interest and costs of this action as permitted by law, for any and all monetary and/or non-monetary losses;

c.    Such other and further relief at law or in equity as this Court may deem just and proper.

Dated: New York, New York
       October 2, 2025

By: _____
    Jaehyun Oh
    The Jacob D. Fuchsberg Law Firm, LLP
    *Attorneys for Plaintiffs*
    3 Park Avenue, Suite 3700
    New York, New York 10016
    (212) 869-3500, ext. 245
    j.oh@fuchsberg.com

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KAREN MARIN MORENO and JOHN CROAK, <br><br> Plaintiffs, <br><br> -against- <br><br> ELLEN K. RITCHIE, M.D., NEWYORK-PRESBYTERIAN / WEILL CORNELL MEDICAL CENTER, and NEW YORK-PRESBYTERIAN HEALTHCARE SYSTEM, Inc., <br><br> Defendants. | Civil Action No.: <br> 1:25-cv-8188 <br><br><br> **CERTIFICATE OF MERIT** |

JAEHYUN OH, the undersigned, an attorney duly admitted to practice in the Courts of New York State, states and affirms that she is a partner of The Jacob D. Fuchsberg Law Firm, LLP, attorneys for the Plaintiffs in the within action. She has reviewed the facts of this case and has consulted with at least one physician who is licensed to practice in this State or any other state and who she reasonably believes is knowledgeable in the relevant issues involved in this action, and she has concluded on the basis of such review and consultation that there is a reasonable basis for the commencement of this action.

Dated: New York, New York
      October 2, 2025

By: _____
      Jaehyun Oh
      The Jacob D. Fuchsberg Law Firm, LLP
      *Attorneys for Plaintiffs*
      3 Park Avenue, Suite 3700
      New York, New York 10016